IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| David Lee Milliken,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>Commissioner of Social Security,<br><br>　　　　Defendant. | CASE NO. 3:22-cv-01219<br><br>DISTRICT JUDGE<br>James R. Knepp II<br><br>MAGISTRATE JUDGE<br>James E. Grimes Jr.<br><br>**REPORT &<br>RECOMMENDATION** |

Plaintiff David Lee Milliken filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying disability insurance benefits. This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c). The matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

## Procedural background

In May 2019, Milliken filed an application for disability insurance benefits alleging that he had been disabled since July 24, 2018,[1] due to recurrent, severe major depressive disorder, chronic post-traumatic stress

---

[1]　"Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

disorder (PTSD), severe anxiety, attention deficit hyperactivity disorder (ADHD), chronic pain in his shoulders, neck, and back, sciatica, and tinnitus. Tr. 300, 516. The Commissioner denied Milliken's application at the initial level and upon reconsideration. Tr. 337–49, 351–63. Milliken requested a hearing before an Administrative Law Judge (ALJ). Tr. 370–71.

In May 2021, ALJ Allison Dietz conducted a hearing at which Milliken and a vocational expert testified. Tr. 272–99. In July 2021, the ALJ issued a written decision finding that Milliken was not disabled. Tr. 247–71. The ALJ's decision became final in June 2022, when the Appeals Council declined further review. Tr. 1–4; *see* 20 C.F.R. § 404.981. Milliken filed this action in July 2022. Doc. 1. He asserts the following assignments of error:

> 1. The ALJ's decision at step three of the five-step sequential evaluation process is not supported by substantial evidence. Rather, substantial evidence supports that Plaintiff meets a Listing. In particular, the evidence does not support the ALJ's finding for the "paragraph B" criteria of Listings 12.04 and 12.15.
>
> 2. The ALJ failed to use the correct legal standard in rejecting the statements of Plaintiff's treating providers.

Doc. 6, at 2.

## Factual background

1. *Personal and vocational evidence*

Milliken was born in 1979 and was 42 years old on the onset date of his

alleged disability. Tr. 264, 300. He was last insured on March 31, 2021.[2] Tr. 512. Milliken is a veteran of the United States Air Force and has a masters' degree. Tr. 517. He used to work as a senior systems engineer and signals intelligence analyst. Tr. 542.

2. *Mental impairment evidence*[3]

*2.1 Before Milliken's July 24, 2018 disability on-set date*

In April 2015, Olayinka Johnson, M.D., diagnosed Milliken with recurrent major depressive disorder, generalized anxiety disorder, PTSD, and AHDH, and prescribed medications including Wellbutrin and Adderall. Tr. 650. The record does not contain mental health notes again until April 2017, when Milliken began to see Hailey Hegland, Ph.D., for medication management and therapy. Tr. 723–24. At that appointment, Milliken indicated

---

[2]      To be entitled to Disability Insurance Benefits, a claimant must be a wage-earner who accumulated sufficient earning credits and became disabled before the end of his or her insured date. *See, e.g.*, 42 U.S.C. § 423(c)(1); *see also Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Soc. Sec. Disab. Claims Prac. & Proc.* § 5:3 (2nd ed. 2022).

[3]      This recitation of evidence is not intended to be exhaustive and is limited to the facts provided in the parties' briefs. Notably, Milliken has not complied with the Magistrate Judge's Initial Order, which directs the Plaintiff to "support[]" each factual assertion in the facts section of the brief with a "citation to an exact and specific transcript page number" and to "specifically cit[e] evidence in the transcript that supports Plaintiff's arguments." *See* Magistrate Judge's Initial Order, ECF No. 5, at 3. Instead, Milliken's brief contains a series of broad summarizations, at times citing as many as 16 pages to support a single assertion, *e.g.* Doc. 6, at 15, n.49–52, interspersed with references that seem specific but aren't cited with specificity, *Id.* at 8, n.28 (citing 14 pages to support the assertion "On one occasion, he reported not leaving his home for the prior week").

that he was in the process of relocating from Maryland, where he was living, to Colorado and interested in "re-establish[ing] care." Tr. 723–724. Milliken reported that he had left a "high stress and career-oriented" lifestyle in Maryland and that he had "PTSD" "related to his family environment growing up." Tr. 723.

In April and May 2017, Milliken saw a physician's assistant. Tr. 713–18. He reported previously taking Ativan but said that it interfered with his memory. Tr. 716. Milliken reported having intrusive thoughts, erratic sleep, nightmares, and said that he felt nervous, anxious, or on edge nearly every day. Tr. 713. He indicated that he was not able to control his worrying and was so restless that it was hard for him to sit still. *Id*.

In May 2017, Milliken saw Dr. Hegland. Tr. 927–33. He reported struggling to understand his response to things at times, and said that he sometimes had a reaction more related to past trauma rather than the present. Tr. 929. In late May, Milliken informed Dr. Hegland that he would be travelling to Maryland and was likely to be away for "6 weeks or so." Tr. 927.

In August 2017, Milliken saw Dr. Hegland following "an absence of several months" because he had been traveling. Tr. 924. Milliken reported that it had been a difficult trip and he had experienced a lot of stressful emotions. *Id*. He told Dr. Hegland about being stopped in Texas at the Mexican border, where he had been arrested on charges including felony possession of marijuana. *Id*. Milliken said that he wasn't sure what was going on with the

4

case against him since the charges were out of state. Tr. 924–25. He told Dr. Hegland about visiting his parents in Ohio, which he also described as difficult, although he mentioned being able to have good conversations with them about his struggles. Tr. 925. Milliken indicated he had been doing yoga, which Dr. Hegland encouraged as a way for Milliken to reduce physical tension and anxiety. *Id*. Two weeks later, Milliken saw Dr. Hegland again. Tr. 919–22. He indicated that he was overwhelmed due to his legal and financial situation, Tr. 922, and had canceled a trip with his sister to stay home and "try to get his legal issues straightened out," Tr. 919–20. He reported an increase in nightmares. Tr. 920.

In September 2017, Milliken met with Dr. Hegland. Tr. 908, 913, 916. He reported nightmares and problems sleeping but said that his medication— Trazodone—helped some. *Id*. He indicated that stress from his former job was continuing to affect him and that he "generally felt very unsafe most of the time." Tr. 914.

In October 2017, Milliken met with Dr. Hegland. Tr. 898–905. He reported that his anxiety remained debilitating and that he was avoiding things and isolating himself. Tr. 901–05. Milliken indicated that earlier in the month, after an argument, he had moved out of his sister's home and into his own apartment. Tr. 901, 904. He said that he liked the new place but acknowledged engaging in security and safety behaviors to reduce anxiety and fear. Tr. 899.

In late October 2017, Milliken began seeing psychiatrist Regina Johnson, M.D. Tr. 936. He reported that he was taking his medications as prescribed and that his days ranged from "good" to "less good" if he had trouble sleeping. Tr. 937. Milliken said that he didn't get out much and was not sure whom he could trust, but Adderall helped him focus. *Id*. Dr. Johnson found Milliken's mood to be anxious and depressed, his thoughts paranoid, his insight and judgment fair, and his knowledge, attention span, and concentration good. Tr. 940. Milliken reported to Dr. Johnson that due to depression he had not worked in over 18 months and that he had experienced progressively more absences before he was let go of his previous job. Tr. 937.

In January 2018, Milliken saw Dr. Hegland. Tr. 867–79. He reported that when he took his medication consistently for a week, he realized that it made a big difference. Tr. 878. Dr. Hegland encouraged Milliken to set reminders for his medications. *Id*. Dr. Hegland observed that Milliken seemed calmer and more comfortable. *Id*. He reported "making some headway" with his legal issues in Texas and feeling positive about that. *Id*. Milliken expressed his desire to have a housewarming party for his new place and said that he felt comfortable enough to let his guard down to some degree. *Id*.

In February 2018, Milliken saw Dr. Hegland. Tr. 861–64. He indicated that things went better when he was more consistent with his medications. Tr. 863. He described having some difficulty getting along with his sister and her wife. Tr. 846, 854, 861.

6

In March 2018, Milliken described going out one evening to play pool, and chatting with an older couple next to him at the bar. Tr. 848. He said that the interaction felt good in the moment but afterward, he needed three days to recover. *Id*.

In April 2018, Milliken saw Dr. Hegland and reported that he had travelled to Texas for a hearing on his marijuana possession charges, which involved two felonies and a dropped misdemeanor charge. Tr. 840, 975. He indicated that he ran out of Xanax but did not call for a refill, and that stress and running out of Xanax had caused him not to sleep well. Tr. 975. Milliken reported that he was "barely getting out of his house" though he was able to eat food he had stored in his freezer, and indicated that he intended to go to the grocery store on his way home. *Id*.

In May 2018, Milliken met with Dr. Hegland and Dr. Johnson. He reported that after his mother had been diagnosed with cancer, he had flown to Ohio and was heartened to know that the cancer had not metastasized. Tr. 831–32, 972. Milliken reported "hiding in sleep during the day," retreating to the house, and not getting out to socialize. Tr. 972. He indicated that he planned to use his therapy skills to help recover from socialization and was both excited and nervous to see how he would do. Tr. 829–30.

In June 2018, Milliken saw Dr. Johnson and described six weeks of upcoming social plans. Tr. 969. Two weeks from the date of the appointment, he would be travelling to Wisconsin to visit some good friends with four

7

children who call him "Uncle Dave." *Id.* Two weeks after that, Milliken planned to see his mother and celebrate his grandmother's 85th birthday. *Id.* Two weeks after that, he'd be travelling to New York to see a friend and attend a special concert. *Id.* Milliken said that there would be "much driving." *Id.* He reported pushing his comfort zone by going to a Cirque du Soleil performance and an electronic dance music show. *Id.*

### 2.2 After July 24, 2018

In September 2018, Milliken saw Dr. Johnson. Tr. 963. He reported that he was "too overwhelmed and had to simplify things." Tr. 963. Milliken described himself as stressed and said that he was losing weight. Tr. 963. He indicated that he had drawn emotional energy from spending time with three good friends. *Id.* Dr. Johnson found Milliken's mood anxious and depressed, his affect constricted, and noted that Milliken had a tremulous voice and a shaky body. *Id.* Milliken reported running out of Adderall the week before and said that if he falls asleep before he remembers to take Trazodone and Prazosin, his sleep is fragmented and shallow. *Id.* He indicated that he needed to schedule therapy with Dr. Hegland. *Id.*

In November 2018, Milliken returned to therapy with Dr. Hegland "after an absence of several months." Tr. 820. He indicated that he had been traveling "back and forth" to Ohio to help his parents and had spent a lot of time with his father. Tr. 820. Milliken was still struggling to get along with his sister and had been spending less time at her house to avoid the strain. Tr. 820–21. He

acknowledged that he had been doing okay but wanted to get back into regular therapy. Tr. 821.

In December 2018, Milliken saw Dr. Hegland and reported that the previous week had been "very bad and he had not left his apartment." Tr. 818. Milliken indicated he would speak to Dr. Johnson about the fact that his Xanax was "not really doing anything." *Id*. Milliken attributed the downturn in his mood to "poor performance in stock market, which was affecting his retirement, which is what he was currently living off of." *Id*.

In January 2019, Milliken met with Dr. Hegland and informed her that he was ready to work on his trauma. Tr. 814. He reported an increase in nightmares and acknowledged that he hadn't been using his therapy skills of self-care and progressive muscle relaxation before bed. Tr. 812.

In February 2019, Milliken met with Dr. Hegland and indicated his week had been more productive. Tr. 802. He was struggling with memories of being abused by his brother. Tr. 805.

In March 2019, Milliken saw Dr. Hegland and indicated that he had signed up for a Dungeons & Dragons beginners league at a local gaming store, in an effort to participate in social activities and get out of his house. Tr. 796. He reported ongoing interpersonal issues with his sister, his sister's wife, and his sister-in-law's sister. Tr. 799. Milliken agreed he should avoid engaging in unhelpful family dynamics. *Id*. He reported increased nervousness about his former job that had resulted from a "situation that had come up with an old

9

friend who still worked there" and was receptive to processing his reaction. *Id*. Milliken acknowledged that he had come a long way in dealing with the anxiety he experienced because of his old job. *Id*.

In May 2019, Milliken saw Dr. Hegland and reported he was unsure about dating since more social interaction increased his anxiety. Tr. 780–81.

Also in May 2019, Dr. Hegland and Dr. Johnson drafted a joint letter to "Disability Determination Services" indicating that Milliken "is being treated for and meets" the criteria for chronic PTSD, severe recurrent major depressive disorder without psychotic features, and ADHD, predominantly inattentive type. Tr. 670. Both doctors further opined that Milliken's functioning was "severely impaired by symptoms of PTSD and depression," and listed his symptoms. *Id*. The doctors opined that Milliken's mental health symptoms "have prevented him from being successful in the work place for the past several years." *Id*. They opined that, "Milliken would be unable to maintain substantial gainful employment at this time." *Id*.

In June 2019, Milliken met with Dr. Hegland and indicated that he was having a somewhat better week and looking forward to some upcoming travel. Tr. 761. Two weeks later, Milliken met with Dr. Johnson and described having gone to Maryland to attend a concert with a friend where he was "spiritually buoyed by the music," and then returning to entertain his friends and their four children. Tr. 948, 951. Milliken said that he had thrived during their visit. Tr. 948.

In August 2019, Milliken saw Dr. Hegland and reported that due to the poor performance of the stock market, which was his primary source of income, he had experienced two "bad" weeks. Tr. 755. He was exploring the possibility of moving again and looking at places in Colorado where it was cheaper to live. Tr. 756. Milliken reported that he had continued to attend his Dungeons & Dragons group meetings and that he felt good because he had been invited to join another group by the people with whom he played. Tr. 755–56. Later in the month, Milliken indicated that his depression had been a lot worse and that, because it had been so hot, he had been sitting in his apartment obsessing over negative things. Tr. 750.

In September 2019, Milliken met with Dr. Hegland and reported that he had attended a multi-day music concert and had a bad experience on the final night. Tr. 745. Later the same month, Milliken told Dr. Hegland that he had "had a panic attack" when he realized that he had not opened his mail in a year. Tr. 743. He reported having booked a flight so he could travel to Wisconsin and finally deal with a criminal case that was pending against him in that state for driving under the influence. *Id*. Milliken discussed the difference between anxiety and paranoia with Dr. Hegland after mentioning instances in which members of his gaming group had asked questions or made comments that he, in reading between the lines, believed might have been about him. *Id*. He said he was not functioning very well in his daily life. *Id*.

11

In October 2019, Milliken met with Dr. Hegland. Tr. 1018–19, 723–26, 735–39, 1036–38. He indicated that he had taken a plea in his Wisconsin DUI case and was disappointed to learn that he needed to have a substance abuse assessment conducted in Wisconsin. Tr. 736, 1018–19, 1036. Milliken reported being overwhelmed with financial distress, including a six-figure credit card bill, and had decided to contact a bankruptcy attorney. Tr. 1018. He had also been contacted by the state of Colorado advising him of an issue with his 2017 taxes. Tr. 736.

In November 2019, Milliken met with Dr. Hegland and indicated that "it had been a rough couple of days and that, aside from [Dungeons & Dragons] and going to a Broncos game on Sunday," he had been staying home and watching Netflix. Tr. 1039–40.  He said that he had been anxious and needed to take an extra Xanax to get through the game. Tr. 1040. Milliken "tried to invite" members of his gaming group and felt lonely when "no one could go and not many people had responded." *Id*.

In November 2019, Dr. Hegland and Dr. Johnson reissued their May 2019 joint letter verbatim. *Compare* Tr. 670, *with* Tr. 1002.

In December 2019, Milliken saw Dr. Hegland and reported that he "ended up being able to travel and [went] to South Carolina" to attend a Phish concert with a friend. Tr. 1054–55. Dr. Johnson adjusted Milliken's medications. Tr. 1023. Tapering Adderall and increasing Trazadone led to an

"almost immediate drop in energy." *Id*. Milliken reported an inconsistent appetite and said that his memory was not very good. *Id*.

In early February 2020, Milliken saw Dr. Johnson. Tr. 1029–35. He indicated that he would be moving to Wisconsin to address issues with his drivers' license. Tr. 1029. Dr. Johnson found that Milliken was tense and anxious, with visible tension in his "shoulder girdle" and his hands trembling. *Id*. Milliken reported finding two "devices" under his dashboard and thinking that they might have been placed there to track his car. Tr. 1029–30. He indicated feeling a sense of doom and that he hadn't been able to connect with Dr. Hegland for therapy since mid-December. Tr. 1030.

In March 2020, Milliken saw Paul Stevens, M.D, a Wisconsin family physician, and reported having relocated to Wisconsin two weeks earlier. Tr. 1148. Milliken informed Dr. Stevens of his plans to move "temporarily to Toledo, Ohio," to care for his parents and grandmother during the pandemic, but expressed his intention to return to Wisconsin. Tr. 1142. Milliken complained of nightmares associated with his PTSD. Tr. 1144.

By December 2020, Milliken had relocated to Ohio and saw Vishwas Mashalkar, M.D., for initial psychiatric evaluation. Tr. 1132–34. Milliken reported a depressed mood, which was worsening, and increased episodes of depression, which were not "responding to multiple prescribed medications." Tr. 1132. Milliken informed Dr. Mashalkar that he was taking Wellbutrin, Buspar, Prazosin, Remeron, Xanax, and Adderall. Tr. 1133–34. He reported

being in the secret service and doing extremely confidential things when he was in the Army that were against his belief system. Tr. 1132–33. Milliken said that he couldn't talk about some of the things he had done. Tr. 1132. Dr. Mashalkar found that Milliken had a disheveled appearance, passive attitude, and a mood that was anxious, depressed, irritable, restricted, and withdrawn. *Id*. Dr. Mashalkar noted that Milliken's speech was delayed and monotone and that his concentration was impaired. *Id*. Dr. Mashalkar prescribed Abilify after diagnosing Milliken as having PTSD with delayed expression, generalized anxiety disorder with panic attacks, and ADHD inattentive type. Tr. 1133. Dr. Mashalkar observed that Milliken was on a lot of medications, which made it difficult to suggest which ones to taper or assess which medications weren't working. *Id*.

In January 2021, Milliken saw Dr. Mashalkar. Tr. 1129. Milliken's condition had not changed and he reported having nightmares and flashbacks. Tr. 1129. Milliken indicated he was having severe anxiety and trouble sleeping. Tr. 1131. Milliken declined therapy services when Dr. Mashalkar offered, indicating that he did not feel that therapy would benefit him. *Id*.

In February 2021, Milliken saw Dr. Mashalkar. Tr. 1125–28. Milliken indicated that since he'd worked in intelligence, he felt that "sometimes they track him because he left the agency." Tr. 1125. He indicated that he was not comfortable online and does not own a smartphone "because he does not like being examined." *Id*. Dr. Mashalkar observed Milliken to be anxious,

hypervigilant, and paranoid. Tr. 1126. He observed that Milliken's appearance was bizarre and disheveled; his attitude was evasive, guarded, and suspicious; his speech was monotone and delayed; and his concentration was impaired. *Id*. Dr. Mashalkar found Milliken "very tremulous." Tr. 1125. Dr. Mashalkar noted that some of Milliken's medications might be worsening other of his symptoms. Tr. 1127. For example, stimulant medications and Wellbutrin could exacerbate Milliken's nightmares and flashbacks. Tr. 1127.

In March 2021, Milliken saw Dr. Mashalkar. Tr. 1121–24. He insisted on an in-person appointment out of a fear of being monitored. Tr. 1121. Dr. Mashalkar noted that it was unclear whether Milliken was paranoid or being followed, since Milliken was, overall, very rational and some of his fears appeared realistic. *Id*. Dr. Mashalkar observed that Milliken presented with significant fear and self-doubt as well as nightmares and flashbacks from witnessing abuse in the past. *Id*. Dr. Mashalkar again informed Milliken that some of his medications could be increasing the paranoia, anxiety, nightmares, and flashbacks he was experiencing. *Id*. Milliken reported that he was still feeling anxious and paranoid but Abilify helped. *Id*.

15

3. *State agency and other medical opinion evidence*[4]

In December 2019, state agency psychologist MaryAnn Wharry, Psy.D.,
reviewed the medical evidence and opined that Milliken could make complex
decisions, work on abstract ideas, make independent judgments, and respond
appropriately to supervisors and coworkers, but should have minimal
interaction with the general public. Tr. 312.

In June 2020, upon reconsideration, state agency Ann Naplin, Ph.D.,
reviewed the medical evidence noted that Dr. Hegland's opinion was "less
persuasive" because it was submitted "without substantial support from [Dr.
Hegland]." Tr. 332–33. Dr. Naplin opined that Milliken could perform work
involving some skills but not complex duties; could respond appropriately to
supervisors and coworkers but must have minimal interaction with the general
public; and that his symptoms might interfere with his completion of the
workday or work week and cause Milliken to work at an inconsistent pace. Tr.
332.

In April 2021, Dr. Mashalkar provided his check-the-box assessment of
Milliken's mental health in a medical source statement. Tr. 1139–41. Dr.

---

[4]     When a claimant applies for disability benefits, the state agency creates
a record. The record includes the claimant's medical evidence. A state agency
disability examiner and a state agency physician or psychologist review the
claimant's record and determine whether and to what extent the claimant's
condition affects his or her ability to work. If the state agency denies the
claimant's application, the claimant can ask for reconsideration. On
reconsideration, the state agency updates the record and a second disability
examiner and doctor review the file and make a new determination. *See, e.g.*,
20 C.F.R. § 404.1615.

Mashalkar opined that Milliken had mild to no impairment in his ability to understand, remember, and carry out simple instructions. Tr. 1140. Dr. Mashalkar found marked limitations in Milliken's ability to make judgments on simple and complex work-related decisions; understand and remember complex instructions; carry out complex instructions; interact with public, supervisors, and coworkers; respond appropriately to usual work situations and changes in routine work setting. Tr. 1139. Dr. Mashalkar cited factors including Milliken's anxiety, apprehension, paranoia to support his findings. Tr. 1139.

4. *Testimonial evidence*

Milliken and a vocational expert testified during the hearing in May 2021. Tr. 272. Milliken was represented by attorney Laura Wilson. Tr. 272, 274–78, 299. Attorney Wilson began the substantive portion of the hearing with an opening statement in which she asked the ALJ to consider Milliken as specifically meeting the criteria for Listing 12.04—depressive, bipolar, and related disorders—and Listing 12.15—trauma and stressor-related disorders. Tr. 278. Then Milliken testified. Tr. 278–95.

Milliken lives with his parents in Toledo, Ohio. Tr. 279. He can be left alone at home and leave on his own, though not without his "anxiety and issues." Tr. 279. He originally told his doctors that he was returning to Ohio to care for his parents but Milliken testified that that they were more taking care of him. Tr. 280. Milliken has a hard time getting up and doing anything at all.

*Id.* He rarely, if at all, helps with household chores. *Id.* Milliken's parents "pretty much" take care of "everything" for him. *Id.* He is able to make simple meals for himself but says that it's been "years" since he independently met his own personal care needs like taking a shower, bathing, using the restroom, brushing his teeth, getting dressed, and brushing his hair. Tr. 281. Milliken testified that it had been weeks since he took a bath and "probably weeks" since he brushed his teeth. *Id.* He does not handle his own errands at the bank, post office, or pharmacy; his parents take care of those things. *Id.* Milliken does not leave home by himself unless he has to, even just to go out in the yard. Tr. 290. Milliken has no physical barriers preventing him from doing things for himself; his barriers are "all" psychological and emotional. Tr. 282. He indicated that his medication helps, though there have been times that he struggled to take his medication. Tr. 290.

Milliken "very, very rarely" goes to the grocery store or to restaurants. *Id.* When he is out in public, he is very anxious about everyone and everything around him. Tr. 290–91. Milliken carries notepads to keep his thoughts organized. Tr. 291. His sleep isn't good and he sleeps incrementally. *Id.* Although he has been to concerts and gone out to play pool, he would not have done those things without the encouragement of his medical providers. Tr. 291–92. One night of going out will take him "weeks' recovery time." Tr. 292. He has regular panic attacks when he leaves his parents' spare room and

leaving their house is worse. *Id*. He has gone "months" without leaving home. Tr. 292–93.

Milliken joined the Air Force in 1998 and was honorably discharged in 2004. Tr. 283. He has a bachelor's degree in communications and a master's degree in business administration (MBA). Tr. 283. After he separated from the military, he worked for GCI Incorporated as a "comp director" for the CIA doing "classified work" that he "can't really talk about." Tr. 284. Milliken worked on and with computers, analyzing data for intelligence reports. Tr. 285. He worked at a desk  but was also involved in "physically demanding training" like "being able to lift weights." *Id*. Now, though, he does not like to leave his parents' house, or be around technology or people. Tr. 282. Milliken considers cell phones and computers to be insecure and notes that his have been hacked. *Id*. When Attorney Wilson asked Milliken to recall the last time he took a call on a cell phone, he indicated he did not know and that it had been "a long time." Tr. 289.

Milliken is unable to work because he can no longer accomplish the things that he used to accomplish. Tr. 286. Every time he sees a cell phone or a computer, he gets severe anxiety and it's hard for him to do anything. *Id*. When he goes out in public, he has a "really, really long recovery time where nothing gets done at all" because he needs isolation and "psychological … readiness, preparedness [to] deal[] with people and … social environments." Tr. 287. Milliken only has a cellular telephone as a "necessary evil." Tr. 288.

He made his parents unplug all of their smart home devices and accessories like Google home and Amazon Alexa because he doesn't like "how they're always listening." Tr. 288–89.

After Milliken, vocational expert Shawna McCullah testified. Tr. 295–99. The ALJ and McCullah discussed Milliken's past work as a systems analyst. Tr. 295–96. McCullah classified Milliken's prior work as skilled work, at a skill level 7, that required a sedentary level of exertion. *Id.* McCullah said that a hypothetical individual with the same age, education, and work experience as Milliken would not be able to perform Milliken's past work as actually or generally performed if the hypothetical individual had the limitations assessed in Milliken's residual functional capacity (RFC),[5] described below. Tr. 296. McCullah said that within Milliken's RFC, an individual like Milliken could perform work that required any level of exertion. Tr. 296–97. At a medium level of exertion, McCullah opined that the individual would be able to perform the job of hand packager or dishwasher. Tr. 297. Such an individual would be precluded from all work if he or she needed frequent supervision in order to timely and correctly complete assigned tasks. *Id.* McCullah said that if the individual "missed two unscheduled days in a

---

[5]     An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard c. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it is the Social Security Agency's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

month," the individual would likely be terminated "at the third unscheduled absence," and if the individual "were off task 13% or more of an eight-hour workday, they would be precluded from all work in the national economy." Tr. 298.

### The ALJ's decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on March 31, 2021.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of July 24, 2018 through his date last insured of March 31, 2021 (20 CFR 404.1571 *et seq*.).

3. Through the date last insured, the claimant had the following severe impairments: Depression; Anxiety; Posttraumatic Stress Disorder (PTSD); Attention Deficit Hyperactivity Disorder (ADHD) (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: frequent claimant of ramps and stairs; occasional climbing of ladders, ropes and scaffolds; frequent kneeling, crouching, crawling; occasional stooping; no

exposure to unprotected heights or moving mechanical parts. The claimant was further limited to "low stress" work, which is defined as: work in an environment free from fast-paced production requirements (such as an assembly line wherein each task must be completed within a strict timeframe) with only simple decision-making and few, if any, workplace changes. Finally, the claimant was limited to no more than occasional contact with supervisors and coworkers (no tandem work groups); no contact with the general public.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on March 23, 1979 and was 42 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from July 24, 2018, the alleged onset date,

> through March 31, 2021, the date last insured (20
> CFR 404.1520(g)).

Tr. 250–66.

## Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

> 1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.
>
> 5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence

24

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

## Discussion

*Issue 1: Challenging the ALJ's conclusions following her consideration of the four areas of mental health functioning contemplated by paragraph B under Listings 12.04 and 12.15.*

Milliken says that substantial evidence does not support the ALJ's decision finding that he did not meet "paragraph B" criteria under Listing 12.04 or Listing 12.15. Doc. 6, at 14. To meet or equal paragraph B, an individual's mental disorder must result in an extreme limitation of one, or a marked limitation of two, of the four areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(A)(2)(b).

Milliken provides what he argues is substantial evidence in support of the finding that he is markedly limited in his ability to interact with others; concentrate, persist, or maintain pace; and adapt or manage himself. Doc. 6, at 15–18 (interacting with others), 18–19 (concentrating, persisting, or

maintaining pace), 19–21 (adapting or managing himself). And while Milliken claims that the evidence does not support the ALJ's finding for the "paragraph B" criteria of Listings 12.04 and 12.15, *id*. at 14, he never explains why this might be so.

Instead, after reciting the applicable standards, *id*., Milliken summarizes evidence without specificity and lacking an indication of whether the portion of the transcript cited describes events occurring during the relevant time period. *See id*. at 15–21, n. 46–94. Milliken asserts that he meets the criteria for paragraph B under both Listing 12.04 and Listing 12.15, *id*. at 14–15, and claims the ALJ erred, but does not explain how the ALJ's decision is *not* supported by substantial evidence, *id*. at 15–21.

This matters because "so long as substantial evidence supports the conclusion reached by the ALJ," it doesn't matter if substantial evidence also supports a claimant's position. *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). So, whether—as Milliken says—the record supports a marked impairment in his ability to: (1) interact appropriately with the public, supervisors, and coworkers, Doc. 6, at 17–18; (2) concentrate, persist, and maintain pace, *id*. at 18, 19; and (3) adapt or manage himself, *id*. at 19, 20; is irrelevant unless he shows that substantial does not support the ALJ's decision, *see Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Milliken has thus forfeited his arguments that the ALJ's decision is unsupported by substantial evidence. *See McPherson v. Kelsey*, 125 F.3d 989,

26

995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."). Milliken may disagree with the ALJ's conclusion, but disagreement does not "provide a basis for remand." *Steed v. Colvin*, No. 4:15cv01269, 2016 WL 4479485, at *10 (N.D. Ohio Aug. 25, 2016).

Further, the ALJ's decision is supported by substantial evidence. The ALJ found that Milliken had no marked or extreme limitations in any of the four areas of mental health functioning, and, therefore, that his impairments did not meet or equal any Listing. Tr. 255–56. The ALJ discussed Listings 12.04 and 12.15, and their respective paragraphs B, as follows:

> The severity of the claimant's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.04, 12.06, 12.11 or 12.15. In making this finding, the undersigned has considered whether the "paragraph B" criteria were satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.
>
> In understanding, remembering, or applying information, the claimant had a mild limitation. He has average to above-average intellect (17F/12-14). His memory was intact or adequate upon mental

27

status examinations throughout the record (*e.g.*, 4F/258-260; 17F/12-14; 19F/7-13).

In interacting with others, the claimant had a moderate limitation. He testified to isolative behavior and paranoid thoughts, and this is documented in the record (4F, 9F, 19F); therefore, his limitation is more than mild. On the other hand, the claimant had friends (4F/228, 232; 17F/5). He was able to travel and attend crowded events such as professional football games and concerts (4F/22-24, 25-26, 228, 232; 9F/24, 39). He participated in a gaming group (4F/22-23, 68, 74; 9F/2-3, 24). There is no evidence of inappropriate behavior in public or significant altercations with others. Accordingly, his limitation was less than marked.

With regard to concentrating, persisting, or maintaining pace, the claimant had a moderate limitation. He was observed to have impaired concentration by his mental health treatment provider (*e.g.*, 17F/12-14), which suggests more than a mild limitation in this area as well. On the other hand, the claimant indicated his focus improved when he took his medications consistently (4F/238). He could maintain sufficient attention to drive (testimony), and play in a Dungeons & Dragons league (4F/22-23, 68, 74; 9F/2-3, 24). Overall, the record does not show that his limitation rose to a marked level.

As for adapting or managing oneself, the claimant had a moderate limitation. He testified that he lacks the motivation to care for his personal needs, and neglects his hygiene for long periods, which constitutes more than a mild limitation. However, he testified that he is able to be at home alone, and he can leave the house independently, when necessary. He indicated he can prepare a simple meal, and drive. The record shows that during the time at issue, he was able to travel, attend multiple concerts, go to a football game, play at a pool hall, and play in a gaming league (4F/22-26, 68, 74, 128, 228, 232, 258; 9F/24, 39). The undersigned has

considered his testimony that he participated in these activities only because his therapist advised him to get out more; nevertheless, he was able to do them. This tends to indicate that his ability to manage himself is at least somewhat within his ability to control. Consequently, his limitation in this area is not shown to be marked.

Because the claimant's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria of listings 12.04, 12.06, 12.11 and 12.15 were not satisfied, through the date last insured. The undersigned has also considered whether the "paragraph C" criteria of listings 12.04, 12.06 and 12.15 were satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria because the record does not demonstrate a medically documented history of a mental disorder existing over a period of two years, with ongoing reliance upon medical treatment, mental health therapy, psychosocial support or a highly structured setting, and only marginal adjustment to the requirements of daily life. The evidence does not show that the claimant requires a highly structured setting such as a residential treatment facility or group home, or has a minimal capacity to adjust to changes, or is unable to function outside his home or a more restrictive setting without substantial psychosocial support (*see* 12.00D).

In a prehearing brief (18E) and during the hearing, his representative argued that the claimant's condition meets listings 12.04 and 12.15. However, in consideration of the evidence set forth above, the undersigned does not find that argument to be persuasive.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and

> 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

Tr. 255–56.

In the decision, the ALJ cites substantial evidence in the record to support finding that Milliken did not meet or equal the paragraph B requirements that a disabled claimant must have a marked limitation in two areas of functioning or an extreme limitation in one. Tr. 255. By separately addressing each of the domains of mental health functioning that Milliken claims to meet or equal, the ALJ supported each finding that he did not with substantial evidence.

At bottom, Milliken's arguments ignore the standard of review and request the Court to reweigh the evidence. But "[t]his court does not weigh evidence, assess credibility, or resolve conflicts in testimony—that's the ALJ's job." *Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x. 192, 196 (citing *Dyson v. Comm'r of Soc. Sec.,* 786 F. App'x 586, 588 (6th Cir. 2019)).

*Understanding, remembering, applying information.* The ALJ found that Milliken had a mild limitation in understanding, remembering, or applying information. Tr. 255. She found his intellect average to above average and his memory intact or adequate, based on her review of the Milliken's mental status examinations included in the record. Tr. 255 (citing 978–80; 1132–34; 1148–54.). This finding is not in dispute; Milliken only argues that

30

the ALJ should have found him markedly or extremely limited in the other areas of mental health functioning. Doc. 6, at 15–21. Here, as in the other three areas, ALJ's decision is supported by substantial evidence.

*Interacting with others*. The ALJ found Milliken moderately limited in his ability to interact with others. Tr. 255. As the basis for finding Milliken's limitation "more than mild," the ALJ cited Milliken's testimony regarding isolative behavior and paranoid thoughts, noting support for his assertions in the records of Dr. Hegland, Dr. Regina Johnson, Dr. Mashalkar, and Dr. Stevens. Tr. 255 (citing Tr. 721–1000, 1017–66, 1142–54). The ALJ then juxtaposed that evidence with the evidence of Milliken's deep friendships, interstate travel, attendance at crowded events such as professional football games and music concerts, and participation in the Dungeons & Dragons gaming league. Tr. 255 (citing Tr. 742–44, 745–46, 949, 952, 953, 1018–19, 1125, 1040, 1055.). The ALJ wrote that while Milliken has been all over the country in these public spaces, there was no evidence to establish him displaying inappropriate behavior or having significant altercations. Tr. 255. She thus found Milliken's limitation in this area less than marked.

Milliken hints at errors by the ALJ in this assessment, arguing that Milliken should have been found markedly to extremely limited in this area based, in part, on his paranoia. Doc. 6, at 18. Like the ALJ, Milliken also cites to Dr. Mashalkar's notes. *Id*. Even if Milliken's hints were sufficient to preserve the issue, Milliken's recitation of the facts is incomplete. The ALJ's finding

includes more thorough consideration of the record as a whole, and remains supported by the evidence.

In the summer of 2018, as Milliken's disability onset date loomed, he saw Cirque du Soleil, attended an electronic dance music concert, travelled to Wisconsin to visit his friends and their four children, celebrated his grandmother's birthday and spent time with his mother in Ohio, and attended a special concert in New York with a friend. Tr. 966, 969. In November 2018, several months after the alleged onset date, Milliken travelled "back and forth" between Colorado and Ohio to help his parents with "several things." Tr. 820. In February 2019, Milliken joined a Dungeons & Dragons league at a gaming store near his home. Tr. 796. He maintained regular participation in that league for nine months, and was popular enough that some of the players in Milliken's group invited him to join them in another league. Tr. 755, 1039.

In March 2019, a friend visited Milliken in Colorado. Tr. 791. In June, Milliken went to Maryland for several days to visit friends and attend a concert. Tr. 759, 948. After that, Milliken's friends from Wisconsin visited him in Colorado and the family of six stayed with him. Tr. 948. In August, Milliken's Maryland-based friend visited him in Colorado and they attended a multi-day music concert together. Tr. 745. In November 2019, Milliken attended a professional football game in Denver. Tr. 1039. In December 2019, Milliken flew to South Carolina where he and a friend attended a multi-day

music concert together. Tr. 1054. In early 2020, Milliken traveled to Wisconsin to face DUI charges. Tr. 1036.

The record also documents Milliken's relocation multiple times during the time period—from Maryland to Colorado, Colorado to Wisconsin, and Wisconsin to Ohio. Tr. 1029, 1148. This evidence shows Milliken's capacity for extensive and prolonged social interaction without any evidence that he interacted inappropriately or negatively with others. The ALJ's conclusion that Milliken's capacity for social interaction is moderately—not markedly or extremely—limited is supported by substantial evidence represents a reasonable conclusion, based on common sense and the record as a whole. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) ("Judicial review of the Secretary's findings must be based on the record as a whole."); *see also Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2020) ("[The court] read[s] the ALJ's decision as a whole and with common sense.").

*Concentrating, persisting, or maintaining pace*. This area of functioning "refers to [a claimant's] abilit[y] to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. Part 404, Subpart P, App. 1, § 12.00(E)(3). The ALJ found Milliken moderately limited in this area. Tr. 255. She recognized Dr. Johnson's opinion that Milliken's concentration was impaired and found Milliken "more than mildly limited." Tr. 255. But the ALJ compared Dr. Johnson's opinion with other evidence in the record such as

Milliken's extensive driving and participation in the Dungeons & Dragons league which required Milliken to concentrate, persist, and maintain pace. Tr. 255. The ALJ acknowledged Milliken's improvement with consistent medication, as well as the overall record, and found that Milliken having an extreme or marked limitation was not supported by the evidence. Tr. 255 (citing Tr. 742–43, 744, 789, 958, 1018–19, 1040.).

Substantial evidence supports this finding. As discussed above, Milliken drove from Colorado to Wisconsin, Ohio, and New York in the summer of 2018. Tr. 966, 969; *see Cundiff v. Comm'r of Soc. Sec.*, 1:18-CV-1249, 2019 WL 5698970, at *7 (W.D. Mich. Oct. 7, 2019) (supporting finding of a moderate limitation in the ability to concentrate, persist, or maintain pace based on the fact that the claimant "used to have a driver's license … until it was revoked after he found guilty of a drunk driving offense" and noting that "[e]ven minimal operation of a motor vehicle requires substantial attention and concentration, in order to remember, understand and carry out complex functions, and to integrate such complex functions into independent situational awareness and projective judgment every few seconds.")

From February through November 2019, Milliken participated in a Dungeons & Dragons league at his local gaming shop and was well-liked enough for another group to attempt to recruit him. Tr. 755, 796. Dungeons &

Dragons is a fantasy storytelling game[6] and Milliken's ability to play, well enough that members of his group invited him to play with them in another league, further supports the finding that Milliken is not markedly or extremely limited in his ability to concentrate, persist, or maintain pace. *See Sherwood v. Comm'r of Soc. Sec.*, No. 3:20-cv-1037, 2021 WL 8342807, at *10 (N.D. Ohio June 21, 2021) (supporting a mild limitation in a claimant's ability to concentrate, persist, or maintain pace based in part on the fact that the claimant met with friends once weekly to play Dungeons & Dragons). Also, the ALJ found generally persuasive the state agency doctors' prior administrative medical findings, which found Milliken's ability to concentrate, persist, or maintain pace moderately—not markedly—limited. Tr. 262, 308–09, 325.

Milliken ignores the standard of review in this argument, pointing to evidence that could support a finding that he is markedly or extremely limited in concentrating, persisting, or maintaining pace—such as medical provider observations and opinions that Milliken had impaired concentration, issues with memory and distraction, anxiety leading to rigidity, and preoccupation due paranoid thoughts, Doc. 6, at 19—however the question is not whether substantial evidence supports Milliken's interpretation of the evidence. The

---

[6]     Dungeons & Dragons is a "role-playing game … for small groups in which each player takes some role, such as a healer, warrior, or wizard, to help the player's party battle evil as directed by the group's Dungeon Master, or assigned storyteller." Hosch, William L., *Dungeons & Dragons*, Encyclopedia Britannica, Apr. 2, 2023, https://www.britannica.com/topic/Dungeons-and-Dragons (last visited May 2, 2023).

issue is, instead, whether substantial evidence supports the ALJ's finding that Milliken was "more than mildly limited." In this area of functioning, as explained above, it does.

*Adapting or managing oneself*. Adapting or managing has to do with "the abilit[y] to regulate emotions, control behavior, and maintain well-being in a work setting." 20 C.F.R. Part 404, Subpart P, App. 1, § 12.00(E)(3). The ALJ found Milliken moderately limited in this area. Tr. 255. The ALJ cited Milliken's hearing testimony that he sometimes lacked the motivation to care for his personal needs and neglected his hygiene for long periods of time, finding Milliken more than mildly limited in his ability to adapt or manage himself Tr. 255. The ALJ contrasted, however, that evidence with Milliken's self-reported abilities to be at home alone, leave the house independently, when necessary, prepare simple meals, and drive. Tr. 255. The ALJ noted the multiple instances documenting Milliken travelling, attending concerts, watching a professional football game at a stadium, playing billiards at a pool hall, and participating in the Dungeons & Dragons gaming league. Tr. 255 (citing Tr. 755, 761, 791, 796, 809, 820, 948, 951, 966, 969). Milliken argues that the ALJ did not properly acknowledge the toll that Milliken's managing himself took. Doc. 6, at 20. But Milliken's argument ignores the ALJ's decision, in which she wrote that she "considered Milliken's testimony that he participated in these activities only because his therapist advised him to get out more; nevertheless, he was able to do them" and found that this "tends to

36

indicate that his ability to manage himself is at least somewhat within his ability to control." Tr. 255. The ALJ also found persuasive the state agency doctors' prior administrative findings, which found Milliken had a moderate limitation in adapting and managing himself. Tr. 262, 308–09, 325. The ALJ "[c]onsequently" found the evidence did not support a finding that Milliken was markedly limited in his ability to adapt or manage himself. Tr. 255. The ALJ thoroughly explained her finding, which is consistent with the record and thoroughly supported by substantial evidence. Milliken argues for a different interpretation of the evidence but this does not entitle him to remand. Little else need be said.

In sum, the ALJ peppered her discussion of each of the four areas of paragraph B mental health functionality with specific, detailed evidence from the record to support her conclusion, ultimately, that Milliken does not have a marked limitation in any of the four areas and thus does not meet or equal Listings 12.04(B) and 12.15(B). Tr. 255–56. Despite citing many pages in the transcript, Milliken fails to demonstrate a flaw in the ALJ's logic or show how substantial evidence *does not* support her findings. Doc. 6, at 15–21. As such, the Commissioner's decision should be upheld.

*Issue 2: Challenging the ALJ's analysis of the medical source opinions provided by Milliken's treating physicians.*

Milliken says that the ALJ did not apply the correct standard when evaluating the medical source opinions of Milliken's treating physicians. Doc. 6, at 21. Milliken claims inconsistency in the ALJ rejecting the 2019 joint letter

submitted by Milliken's Colorado-based psychologist and psychiatrist, Dr. Regina Johnson and Dr. Hegland, while crediting the prior administrative findings of state agency doctors. Doc. 6, at 21. Milliken claims that the ALJ discounted the 2019 joint letter because it did not "provide a function-by-function analysis of [Milliken's] work-related mental abilities" and that such reasoning is not consistent with crediting the prior administrative findings of the state agency doctors, which also lack a function-by-function analysis of Milliken's work-related abilities, Doc. 6, at 21. Milliken then challenges the ALJ's treatment of Dr. Mashalkar's assessed limitations. Doc. 6, at 22.

Milliken's arguments misread the law. Milliken makes his claims with reference to two decisions, from 2013 and 2020 respectively, in which the Sixth Circuit applied the since-abrogated treating physician rule.[7] Doc. 6, at 22 (citing *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376–77 (6th. Cir. 2013) and *Hargett v. Comm'r of Soc. Sec.,* 964 F.3d 546, 552 (6th Cir. 2020)). After reciting the old standard from *Gayheart*, Milliken—incompletely—cites *Hargett*, a case relying on yet a third outdated case, *Hensley v. Astrue*, 573 F.3d 263, 266–67 (6th Cir. 2009), in which the Sixth Circuit specifically stated that it was applying "the treating physician rule in effect at the time that Hargett filed his claim for disability in 2015." *Hargett*, 964 F.3d at 553. But unlike in *Gayheart* and *Hargett* (and *Hensley*, for that matter), it is now the case that an

---

[7]     The "treating source rule," which generally required the ALJ to defer to the opinions of treating physicians, was abrogated by 20 C.F.R. §§ 404.1520c and 416.920c for applications filed on or after March 27, 2017, like Milliken's.

ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any [particular] medical opinion[] ... including those from [a claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a). So it is Milliken, not the ALJ, who relied on an incorrect standard concerning medical-opinion evidence.

Under the applicable standard, the Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, extent, and examining relationship; specialization; and other factors. 20 C.F.R. § 416.920c(a), (c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id*. "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

*The ALJ's non-consideration of the statements in Dr. Hegland's and Dr. Johnson's 2019 joint letter.* In May 2019, Dr. Hegland and Dr. Johnson drafted a joint letter primarily focused on their shared opinion that Milliken was unable to work due to his PTSD and other conditions. Tr. 670. Both doctors reiterated their assertions in the letter in November 2019. Tr. 1002. Milliken refers to this letter as a "treating source opinion" and argues that the ALJ erred by failing to credit and consider it. Doc. 6, at 21.

The ALJ addressed the letter and statements therein:

> With regard to the claimant's mental impairments, on May 13, 2019, Hailey Hegland, Ph.D., the claimant's former psychologist, issued a narrative report outlining the claimant's symptoms and treatment, and concluding he is unable to maintain substantial gainful employment (2F). Dr. Hegland and Regina Johnson, M.D., the claimant's former psychiatrist, jointly issued a report on November 19, 2019, reiterating the claimant's diagnoses, symptoms and treatment, and asserting that his symptoms have prevented him from being successful in the workplace for the past several years, as he has made limited improvement with treatment (5F). This report also concludes that the claimant is unable to maintain substantial gainful employment (*Id.*). However, neither of these reports provide a function-by-function analysis of the claimant's work-related mental abilities and limitations.

Tr. 261.

As an initial matter, under the Commissioner's regulations, the statements contained in the letter do not represent a medical opinion by either Dr. Hegland or Dr. Johnson. The regulations provide that a "medical opinion" is a statement from a medical source about what a claimant "can still do despite" his or her impairments and whether the claimant has one or more

40

impairment-related limitations or restrictions in the ability to: (i) perform physical work activities; (ii) perform mental work activities; (iii) perform other demands of work such as seeing, hearing, or using other senses; and (iv) adapt to environmental conditions such as temperature extremes or fumes. 20 C.F.R. § 404.1513(a)(2)(i)–(iv). The doctors' statements in the letter do not meet this standard. *See* Tr. 670, 1002.

Second, the opinions in the letter regarding Milliken's inability to work are findings reserved to the Commissioner and the ALJ as her designee. *See* 20 CFR 404.1527(d). In the decision, the ALJ correctly explained that:

> [b]road statements that a claimant is "disabled," "able or unable to work," "can or cannot perform a past job," or the like, are not medical opinions, but are administrative findings dispositive of a case, requiring familiarity with the disability regulations and the legal standards set forth therein. Such issues are reserved to the Commissioner and his designees. As these statements are inherently neither valuable nor persuasive, pursuant to 20 CFR 404.1520b(c), the undersigned has not provided further articulation about this evidence.

Tr. 261 (internal citations omitted).

Third, to the extent that the opinions included in Dr. Hegland's and Dr. Johnson's letter might be construed as "other medical evidence"—defined under 20 C.F.R. § 404.1513(3) as evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of the claimant's impairments and medical history, as well as the source's clinical findings, diagnosis, treatment prescribed with response,

or prognosis—the fact remains that the Commissioner was under "no obligation to assess the opinions' persuasiveness. See *Robinson v. Comm'r of Soc. Sec.*, No. 22-1397, 2022 WL 17168444, at *3 (6th Cir. Nov. 22, 2022).

It was not error for the ALJ to disregard statements on an issue reserved for the Commissioner and her explanation in the decision, while brief, suffices.

*The ALJ finding unpersuasive Dr. Mashalkar's opinion on Milliken's social limitations.* Milliken correctly notes that the ALJ found the limitations assessed by Dr. Mashalkar inconsistent with Milliken's self-reported abilities to participate in the activities of daily life. Doc. 6, at 22. He argues that the ALJ did not give enough weight to Milliken's coping skills (*e.g.*, Xanax at the football game), his self-reported feelings while out each time (very paranoid and anxious), and the time it took him to recover from each outing. Doc. 6, at 22–23. Milliken asserts, "Contrary to the ALJ's assertion, these statements are entirely consistent with the record and should not have been rejected. Doc. 6, at 23.

The ALJ considered Dr. Mashalkar's opinion in her decision as follows:

> On April 3, 2021, Vishwas [Mashalkar], M.D., the claimant's current psychiatrist, reported that the claimant has marked limitations in making judgments on simple or complex work-related decisions; understanding, remembering and carrying out complex instructions; and all areas of interacting with others (18F). Dr. [Mashalkar] indicated the claimant has no limitation in understanding and remembering simple instructions, but a mild limitation in carrying them out.

> It was further noted that the claimant is very smart and capable, but has developed a marked fear of working, and feels he is being watched by spy agencies. (*Id.*). [ Dr. Mashalkar]'s opinion is not persuasive, as it is not consistent with the claimant's activities. The claimant is able to perform tasks and engage in activities such as making travel arrangements, including by air; attending concerts in other states that reportedly take place over several days; and attending to his own legal affairs (4F/22-24, 25-26, 228, 232; 9F/24, 39). This evidence is completely inconsistent with the extent of limitations in understanding and carrying out instructions and making decisions that are described by Dr. [Mashalkar]. The claimant's ability to enter crowded concert venues and football stadiums is likewise inconsistent with the limitations in interacting with others suggested by Dr. [Mashalkar]. Thus, this opinion is not supported by or consistent with the other evidence of record.

Tr. 261–62.

Milliken argues that his activities of daily living were not that extensive and that the ALJ discounted the days of recovery Milliken required after any outing. Doc. 6, at 22–23. "Contrary to the ALJ's assertion," Milliken argues, his paranoia and anxiety after each outing, and his need to use additional medication to attend the football game, are "consistent with the record and should not have been rejected." *Id*. at 23.

Milliken fails to establish that the ALJ's finding is unpersuasive Dr. Mashalkar's opinion is not supported by substantial evidence. As with Milliken's other arguments, he ignores the standard of review and invites the Court to reweigh the evidence. *Dyson v. Comm'r of Soc. Sec.*, 786 F. App'x 586, 588 (6th Cir. 2019) (citing *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990)).

As previously stated, review of these matters is conducted under a highly deferential standard of "substantial evidence." *Rottmann*, 817 F. App'x. at 196. Here, Milliken has not shown that the ALJ's findings regarding Dr. Mashalkar's opinions are unsupported by substantial evidence.

Milliken argues that the ALJ improperly relied on evidence of Milliken's inconsistent treatment or lack of compliance with treatment—which is undisputed as a feature of Milliken's mental disorder—in finding that Milliken was not as severely impaired as he claimed. Doc. 6, at 23. But the ALJ did not rely on Milliken's lack of compliance as the basis for her opinion. She summarized his improvement, demonstrated in the evidence, that Milliken experienced with regular medication compliance. Tr. 258. Milliken acknowledged as much himself to Dr. Hegland during two appointments in early 2018. Tr. 878, 863. And, as previously discussed, in finding Dr. Mashalkar's opinions unpersuasive, the ALJ relied on inconsistencies between Milliken's reported abilities and Dr. Mashalkar's limitations, not gaps in Milliken's treatment or medication compliance. Tr. 261–62. Milliken has failed to demonstrate that the ALJ's findings were not supported by substantial, valid, evidence.

And, what's more, substantial evidence *does* support the ALJ's findings. The ALJ determined that Dr. Mashalkar's limitations were unpersuasive to the extent that Dr. Mashalkar opined Milliken was markedly limited in the ability to understand and carry out instructions and make decisions, as well as

all areas of interacting with others. Tr. 262. As in *Rottman*, Milliken's ability to navigate crowded concert venues and football stadiums is "difficult to square" with Dr. Mashalkar's opined severity of Milliken's limitations in understanding and carrying out instructions and making decisions and his capacity to interact with others. *See Rottmann*, 817 F. App'x. at 196. Likewise, Milliken's ability to socialize is inconsistent with a marked limitation.

The record is replete with evidence to support the ALJ's decision to discount Dr. Mashalkar's assessment of Milliken's ability to interact with others as markedly limited. For example, Milliken undertook several road trips during the relevant period, and leading up to the relevant period. He drove to: Wisconsin to visit friends, Tr. 966, 969; Ohio to celebrate his grandmother's birthday and visit his mother, Tr. 966, 969; Maryland to visit friends and attend a music concert, Tr. 948; New York to visit a friend and attend a music concert, Tr. 966, 969; South Carolina to attend a music concert, Tr. 1054; Texas, Tr. 924; and "back and forth" between Colorado and Ohio multiple times, Tr. 820. Milliken reported that he had "thrived" when he hosted his friends' family of six. Tr. 948. He also had a friend visit from Maryland; the two attended a multi-day music concert together. Tr. 745, 791.

Milliken engaged in additional activities that implicated his capacity to make judgments on simple or complex decisions; understand, remember and carry out complex instructions; and all areas of interacting with others. For example, he attended: a Cirque du Soleil performance, Tr. 969; an electronic

dance music concert, Tr. 969; a Denver Broncos game, Tr. 1039; and regularly met up with members of his gaming league to play Dungeons & Dragons, Tr. 1039. He successfully impressed the other members of his team such that they invited him to join another of their groups. Tr. 755–56. Notwithstanding Milliken's claims to the contrary, this is collectively sufficient evidence to support the ALJ decision to give little credit to Dr. Mashalkar's opinion finding Milliken was markedly limited in the ability to make judgments on simple or complex decisions; understand, remember and carry out complex instructions; and in all areas of interacting with others. As such, the Commissioner's decision should be upheld.

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: May 3, 2023

/s/ James E. Grimes Jr.
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019)